We have one case on this afternoon's docket. It's cause number 24-50104 and it is the United States of America v. Antonio Orozco. All right, Mr. Gutierrez. May it please the court, Mr. Bradley. I filed a reply brief in this case on July 26th of last year. On September 18th of last year, this court issued its opinion in the United States v. Diaz, 116F4458, which I consider a watershed opinion. As I read it, it set forth a new paradigm for analyzing predicate felonies in 922G1 cases. From now on, all felonies are not created equal. This is language from the opinion. To survive Diaz's as-applied challenge, the government must demonstrate that the nation has a longstanding tradition of disarming someone with a criminal history analogous to his. Now, the court ended up affirming his conviction because one of his predicates, it may have been his only one, was theft. And the court pointed out that theft at the time of the founding was harshly punished. But the court, in a footnote, said our opinion today does not foreclose future as-applied challenges by defendants with different predicate convictions. Mr. Orozco has different predicate convictions. I attempted to file a supplemental brief in December applying Diaz to Mr. Orozco's prior felonies. I was not granted leave to file that brief. Because Mr. Orozco's case is still pending, I still argue that I should be able in some way to apply Diaz to his situation. This is a quote from a Fifth Circuit case, Matt Turn v. Eastman Kodak, 104F3702. An oral argument panel may review a motion's panel's ruling and overturn it where necessary. I'm asking this panel to do that. Mr. Orozco's three prior felony convictions. Sir, counsel, in your motion, I mean, knowing my luck, I probably was on the panel that denied it. But in your motion you explained there was an intervening decision. It was Diaz, and you'd like to supplement it, and you were told you couldn't file? Well, I filed a motion to supplement accompanied by the brief. The reason for supplementation was Diaz. And, you know, it was a short denial. It just says nondispositive motion. Your motion for leave to file is denied. Because, obviously, Diaz is central now. Is it your understanding that no other circuit has adopted Diaz? Most circuits, by most I mean four or five, are saying, Supreme Court, you've got to go first. Any felony counts until you tell us differently. But the third and the sixth, per the government's latest 28-J, are converging around not unless you can still be disarmed for life if you're dangerous or violent. Is that a fair description of what's going on? And I intend to address the issue of dangerousness. Right. But maybe stick with Diaz, because that is our law. Okay. How do you apply Diaz? Well, I'm getting ready to here, I hope. His three convictions are for possession and importation of marijuana in admittedly large amounts. So the relevant question, as I see it, is this. Does our country have a longstanding tradition of disarming someone who has been convicted of importing or possession of marijuana? I think the answer is no. What about smuggling? Didn't the founders punish smugglers very severely? Well, what were they smuggling? Does it matter? I think it does. Certainly marijuana, I don't think, would have been considered contraband back then. Now, this morning it was brought in various filings that there was a case heard today before us, but it was Kimball. And it's my understanding that the government in Kimball said tobacco smuggling was punished by death. Has that been raised by the government in this case? If that's true, then that's news to me. No, but we'll hear from the government. Did the government raise that as a historical analog in this case, in our case? Did the government? Not in the briefs that I have. I didn't think so. But if tobacco smuggling, then you've got a problem, right? That's an analog. That's why you want to brief it, I take it. Okay. On to the issue of marijuana, because I'm not sure that history would treat marijuana the same as tobacco. Marijuana was not significantly regulated by the federal government until 1937 when they passed the Marijuana Tax Act. Until yesterday, and I have read a good bit of American history, I never have read anything about marijuana during the time of the founding in the 1700s. I read an excerpt yesterday from a book written in 2003 by Robert Deitch entitled Hemp, American History Revisited. This is a quote. We know our colonial Americans were aware of the medicinal properties of cannabis. It was one of the few medicines they had. They used it as commonly as we use aspirin today. That means that in addition to farming hemp for fiber, they cultivated garden varieties of cannabis with a high T. Well, but I guess I'm struggling whether the analog would be marijuana versus tobacco versus hemp versus— Well, we're going to—okay. Or is the analog smuggling and smuggling? You know, in other words, if marijuana wasn't illegal, if it wasn't a controlled substance, there weren't those kinds of things, I guess, back in the founding maybe. But today it is. It's illegal to import it. Right, but as I read Diaz and as I read Bruin and Rahimi, what it is today is not the measure. Well, no, but I remember Rahimi quite well. It doesn't need to be a historical twin. I got you. It just needs to be relevantly similar. Okay. Well, then what if we have a historical twin? I mean, what if we have marijuana? I mean, if marijuana was there, I guess my counter to that would be why do we need to search for another analog if we have marijuana? Also, I'm going to argue based on the Fifth Circuit case, United States v. Connolly, that the analog that this court has—not this panel, but the court has adopted in terms of instead of marijuana is alcohol, and that's where I'm going next. Well, before you go there, in the indictment, the government just said convicted of a crime. That's the way they used to do it. The indictment just says your client had previously been convicted of a felony. Then you get to the factual basis, and it says, well, at least the following two, which is where we see smuggling and possession come in. But then you look at the PSR, and it turns out he's got a theft by check. Well, again— So let me finish the—let me turn then to question. I'm sorry. If he's got a felony conviction for theft by check, we're smack in the world of Diaz, aren't we? Well, as I read it, it's a misdemeanor. Oh, paragraph 37 is a misdemeanor theft count? I'm not telling you I couldn't be wrong. I sure could be, but I thought—I didn't see any felonies. I saw— But if it is a felony, then you're squarely foreclosed. Then I'm in trouble. Okay, but good—I appreciate the concession. And I'm very sympathetic if you asked to be able to brief Diaz and we said no. That, in my mind, is on us, not you. So I really appreciate your flexibility. However, here you are coming up. Judge Ezra allowed you to withdraw the guilty plea, conditional guilty plea, right? So if you win, you get to go back, and Ezra will apply Diaz. We'll know if this is a felony or a misdemeanor. That would be one route. I'm not saying my colleagues would agree, but we could get that answered, and that would end this case maybe. I think so.  I believe so. I'll just finish this. It just said Thomas Jefferson, also a hemp farmer, noted in his diary that he smoked hemp for relief from migraine headaches. Okay, moving on to Conley. Again, this was a 922G3 case. The defendant was charged with possessing firearms and ammunition as an unlawful user of a controlled substance. She apparently smoked marijuana occasionally as a sleep aid for anxiety. And she successfully argued to the district court that her Second Amendment rights had been violated, and that finding was affirmed by the Fifth Circuit. But the Fifth Circuit says, noting that there was very little regulation of drugs until the late 19th century, determined that alcoholics were the most analogous group to marijuana users in the 18th and 19th centuries. And so what I did, for the most part, in my supplemental brief, I used alcohol as the analog. Alcoholics? The Fifth Circuit said alcoholics? Did you say alcohol? The use of alcohol and the use of marijuana, not alcohol. Okay, I thought you said alcoholics. I was hoping we didn't say that. If I said that, I apologize. All right, go ahead. Assuming that alcohol, use of alcohol is an analog. So one of the things I point out in the brief is that all 13 states, alcohol was legal. In fact, the Connolly opinion, early Americans, including the founders, consumed copious amounts of alcohol. And there's a footnote, only a few days before the Constitution signing, a volunteer cavalry corps, they crossed the Delaware River with George Washington. Basically, it gives the tab for these folks. I won't read it all, but they consumed or they purchased a lot of alcoholic beverages. So, again, the Fifth Circuit. You got the tab for the alcohol they put? I beg your pardon? You got the tab? The check? Well, it doesn't say how much it was, but the 55 attendees ordered 54 bottles of Madeira, 60 bottles of Clare, 8 bottles of whiskey, 8 bottles of cider, 12 bottles of beer, and 7 large bowls of punch. I mean, I didn't see the tab. I thought you said tab. I did. I may have, and if I did, I misspoke. I didn't mean to say that. Were there crimes or prohibitions on smuggling alcohol at the founding? Well, I don't think so. Here's what all 13 of the states had, and they may very well have been, because they had taxes. Obviously, if you tried to import it or export it and you violated these excise taxes, I'm sure that was a crime because every one of these. This is from Virginia. Every gallon of rum, one shilling. Every gallon of other distilled spiritus liquors. I'm probably mispronouncing that. Basically, it lists all of the substances and the amount of tax on them. So doesn't it follow, though, if I smuggled it into Virginia without paying the tax and I sold it on the black market, I could be arrested as a smuggler? Again, the difference between what you're arguing, or that's a poor choice of words. To me, it matters what you smuggled. The notion that you smuggled something in illegal, and if you say that smuggling tobacco in was a capital offense, then I'm in no position to disagree with you because I've done it. I'm wondering if smuggling in alcohol, rum from the Caribbean, was also a punishable offense by capital punishment. Well, I didn't know that. I'm wondering. I don't believe – I mean, that seems to me like that would be unusual in the light of the amount of Madeira or whatever that the rest of these folks – in fact, there's a statute in 1753 where the colony of New York passed a statute designed to curb the excessive tax farmers were charging retailers for liquor because they liked liquor. Can I just – I know you've only got three minutes more. Maybe you'll be given a little more. This is all trying to dignify Diaz, and apparently it's in the brief that we denied you the permission to submit. Right. I appreciate we're trying to wonder. We're wondering about Madeira, but this is just the comical quality of litigating the history to me. Could you address the government's brief which says we are not allowed to give exemptions predicate by predicate? Okay. You remember that section citing Lewis? I do. And to me that sacrifices the Second Amendment on the altar of simplicity and convenience. Okay. Again, I filed a 28J letter where I cited to a – well, I'm running out of time here. Pitsilities v. Barr, it's 128F4203 from the Third Circuit. This is an unusual case. This is where the – But right away what you've done now is shifted, and I respect that the government did. You've shifted to the world of range, the Third Circuit. Yes, I have.  So – But the government's argument is that once you're a felon, you're always a felon. That's not – the Fifth Circuit has not adopted that. I agree, but that's the government's argument in their brief. It's a 28J argument. Their principal argument is we can't do predicate by predicate. We have no authority under cases from the Supreme Court like Lewis, and it's also unworkable because Americans who have guns will have no idea whether their felony predicate qualifies or not. Okay. The inconvenience of it to the government and to this court is above my pay grade, and I'll just admit that right now. I'm not going to tell you it's an easy question. I think it's a hard question. I'm arguing for things today that personally I'm not a big fan of, but the law under Diaz is the law. And I think under Diaz, you can – assuming the defendant preserved error, you can analyze them felony by felony. I understand that that's an outlier based on the other circuits. But the government said in its brief even if the Second Amendment applies to some felons, 922G1 is constitutional. It's applied to dangerous felons like Orozco. Okay, is he dangerous? I mean, is importation of marijuana, which I'm not a big advocate of, and that's a huge understatement, does that make him dangerous for the rest of his life? I don't think so. In other words, that just opens up even more questions, right? Is it he was dangerous 20 years ago? Well, he was dangerous nine years ago. Possessed the gun. So it's dangerousness at the time of the possession of the gun. Yeah. It's not dangerous because of the predicate or the current offense. It's the facts exactly pre-framed at the time he possessed the gun. Is that the logic of the Third Circuit's approach? Well, it's not that simple, or at least not as I read it. He requested – and I'm out of time. Can I finish my sentence? Yes. Okay. He argued that his two prior gambling misdemeanors from Pennsylvania that had five-year maximums did not make him dangerous and that he wanted a declaratory judgment to that effect. So what the court said was we're going to send it back. You need to get more background and show us more information about whether he's dangerous or not. As to Mr. Orozco's post-conviction conduct, he went – his supervised release was terminated early. He was allowed to self-surrender in this case, which he did. He's due to be released on June 10th. He started out when he got out of prison working for $1,733 a month. At the time of his arrest, he was making $12,000 a month as a contractor for Republican Services in Midland, Texas. There is no evidence, based on the facts, that he is, as we stand here today, a dangerous person. And I apologize for taking more time. Can I ask one last question? Yeah. Because I'm reading it. You were kind enough to preempt me to say it. They remanded to say we've got to find out everything about this man. Well, he argued – They remanded – let me just read. We don't know anything about his other post-conviction conduct. Right. Conduct. We don't know about gambling business. So the remand is I take it to decide if this man's entire life story reflects dangerousness. If so, he can be dismissed. Well, it certainly is a remand to consider his post-conviction conduct, and that's my argument as to Mr. Orozco. You know, whatever happened before 2014, okay, that's water under the bridge. But does it matter what he's done since? I'm arguing that it does. Yeah, okay. I see. Thank you, Mr. Gutierrez. Ms. Bradley. Thank you. It seems like you were just here. You argued – It's nice to see you again, Your Honor. May it please the Court, Lauren Tanner Bradley for the United States. Two aspects of this nation's historical tradition support disarming convicted drug traffickers like Mr. Orozco. The first was identified by this Court in Diaz, and that was that we have a tradition of severe and permanent punishment of serious crimes, including but not limited to those crimes that were punished by death at the founding. And the second tradition is one that the Supreme Court and this Court have identified, which is that we have a historical tradition of disarming those who pose a dangerous risk of misusing firearms. These two principles, when you take them together, support disarming Orozco, too. In fact, every circuit that has addressed this issue has concluded that drug traffickers can be constitutionally disarmed under 922G1. Every circuit that what? Every circuit that has addressed this issue with respect to drug trafficking has concluded that – Marijuana drug traffic? They have not specified with respect – they've made no distinction between the controlled substances that were actually being trafficked. What's the best circuit that has language that no matter what the drug, if you traffic it, that's enough? The Sixth Circuit talks about drug trafficking just per se being a dangerous activity. That's Williams? That's Williams, yes. And then also we have the White case that was just presented in the 2018 – But I guess – and I actually really appreciated the brief that the government's here, even though it's a while ago. And even if it didn't talk about Diaz much, it did touch on many other things that I've been looking for. So I'm grateful for that. But we do have – why don't you start with Diaz? Because I didn't see it applied in the brief, and it is what appears to be controlling, depending on how you interpret it. Yes. So – and I'll just preface this with an explanation about the briefing. Our brief was also filed prior to Diaz, and then when supplemental briefing was sought, we opposed that request with the caveat that we would prefer to do supplemental briefing in the form of a shorter – not restarting the briefing entirely, but providing supplemental briefing. Should we do that now? Neither side has briefed Diaz. Diaz is our published law. Well, our 28-J letter that we filed after Diaz references our briefing in Kimball, which is a very similar briefing. The latest 28-J grabs for the Third and the Sixth Circuits, and those just are not what we're doing. Well, so – and actually, I do want to go back to that because in terms of what – Answer this briefing question because I agree with Judge Wilson. Is there any reason why the party shouldn't brief Diaz here? You know, I'm not opposed to providing supplemental briefing necessarily in this case. I think that the matter has been briefed with respect to the Kimball case. Nothing prevents us from looking at Diaz and considering it. No, of course not. There's nothing that would prevent us from doing that whether you brief it or not. Of course not. And I think that, you know, candidly, the information that we provide in our 28-J letter is our position. Well, but litigating this by 28-J is a very important issue. The cases are proliferating, and I'm less interested in maybe the party's views of our analysis of Diaz per se as I am what are the historical analogs. I mean, I've asked about smuggling. I've asked about smuggling alcohol per counsel opposites offered analog there. And I just wonder if we – I mean, an analysis of Diaz in this case and other cases. I mean, how does this come out under Range or Williams? I don't know. Clearly, we're bound by Diaz. But you see what I'm saying? We're grappling with how do we do this and how much of it do we do based on what the government's burden is. I hear what you are saying. I do not think that the briefing will look substantially different from the briefing that has been provided in cases like Kimball. The argument – We have to fight this case because I heard that in an oral argument there was reference to capital punishment tobacco smuggling. Have you presented that in this case? So we reference Blackstone, I think at page 155, that smuggling was considered a capital offense at the – Any smuggling. Yes, it speaks about smuggling. Specifically, there's one about smuggling in disguise that is listed there. We also – an argument was presented in Kimball yesterday that was a reference to tobacco trade, and that is in reference to Stuart Banner, the American death penalty. If I smuggle in Nike shoes or something that there's a tariff on, I avoid the tariff. Capital punishment, that's a felony that counts? No matter what the item is that's smuggled in? So I think that what we have to think about is what we're doing under the Rahimi analysis and that we are not – we don't have to have historical matches. We're in search of principles, and so what we are searching for by looking at the historical evidence is we are discerning broad principles and then taking – That's my question. Your broad principle is any smuggling conviction. It's not my broad principle. It is the broad principle established in Diaz that we have a tradition of severe and permanent punishment at the founding. But Diaz – you heard him. He quoted Diaz. Diaz was very careful to say this wouldn't be all offenses. We've got to go predicate by predicate. So I'm asking you at what level of granularity do we look at – is it, as Judge Wilson asked, any smuggling offense qualifies you to lose your gun rights for the rest of your life, or is it smuggling of drugs? So it is the government's position that any felony is sufficient. But I just want to make – I'm trying to listen here, but I want to make something clear. You're not agreeing that any smuggling offense would render you eligible to be disarmed for the rest of your life, any smuggling offense? So my – so the government – If you're agreeing – I mean, if you are agreeing to that, then you are. The government's position is that the legislature has categorically disarmed individuals who have committed a felony, and so if it is considered a felony today, that that is sufficient, and that that is the government's position. This court rejected that position in Diaz. So any smuggling offense that's a felony, you're saying, would render you eligible for permanent disarmament? Yes. All right. And let me explain why. Well, but I'm not going to let you quite explain. You're saying front-level position is you think Diaz is wrong. You think the majority of circuits are right, and you may have seen it. I wrote this in a concurring opinion in Schnur. You think we're still in a world where it's the Supreme Court's job to say we didn't mean what we said in the dicta. But failing that in the Fifth Circuit, you're going to litigate conviction by conviction, and when you get to the Fifth Circuit, you'll say every smuggling felony counts. Is that it? Yes, Your Honor. We agree with the concurrence in Schnur. We recognize that the court has rejected that. But I didn't say it had. I didn't say we were foreclosed. I didn't read Diaz that way. Diaz affirmed the convictions. So Diaz, in terms of the analysis it set forth, arguably, that's dicta. They actually affirmed there. But that's a tight rope, and you're good to not embrace it. So you, before us, are saying you think Diaz foreclosed it, but your brief to us, which predated Diaz, said we couldn't do just what we turned around and did in Diaz, right? Correct. Yeah. But then what do we do in this case under Diaz? I mean, I guess I'm – tell me what the government's relevantly similar analogs are. So the government's relatively similar analogs are smuggling crimes. Basically, that we have a historical tradition in this country of permanently punishing those involved in crimes involving illegal trafficking. Does that apply to alcohol? I'm talking about founding era. Was smuggling alcohol into the country from the Caribbean or wherever, was that a smuggling offense that would be capital? I'm not aware of any, but uniformity of the law is not required. We do have historical analogs that show that smuggling at the founding was, in fact, capital punishment. I mean, I guess by definition, if you're smuggling something, it had to be some sort of contraband. Yes. I think that's right. And so we have – we pointed to a lot of laws that say about smuggling. I've used tobacco as the example. That's Stewart Banner, page 8. And then I've also talked about receipt of stolen goods. That's the – Hold on a second. Yes. Did you just make a statement that it must be contraband if it's smuggling? Oh, I don't – I'm sorry. I'm not sure if I'm – Over here we were talking about Nikes. Well, Nikes aren't contraband. Correct. It would be illegal trafficking. All right. Okay. Yes. I apologize if I misunderstood the question in that sense. But I think that what I'm pointing to is the types of goods, things that were criminalized at the founding and punished by death, things like tobacco, things like stolen goods like a receipt of a stolen horse, that that's not just targeting the act of theft. That's also targeting the actual –  Yes, exactly. And then also counterfeiting. But you're not saying that alcohol is contraband. I am not aware of a historical law that – Well, I guess what I'm asking is back to Counsel Opposite's point. If alcohol is brought in from the Caribbean, St. Thomas, and Virginia requires duties to be paid on the alcohol, but I just bring it in to Chesapeake or whatever and I start selling it without paying the duties, at that point – I mean, maybe I'm overlaying modern alcohol regulations, but at that point it seems to me that maybe the alcohol would be contraband. It would be illegal because you'd be selling it without having paid the duties first. And I think the question is if it was criminalized and criminally punished at the founding. But I also want to get to the point that it is not necessarily that we are matching up historical crimes, historical felonies with modern-day felonies, that the Bruin analysis allows for policy choices to change. And our 21st century laws are not relegated to the 18th century policy – Well, right, like marijuana may or may not have been contraband or an illegal substance in that day and age. Today it is. Therefore, if you bring it across the border, you've committed a crime. The crime would be akin to smuggling. Yes. And then I want to talk about, too, that if you take that, let's also take what we're instructed to do in the Bruin analysis, which is looking at the how and the why. And so we go back to Diaz, and Diaz tells us this broad why. And it says the reason why we were regulating this kind of conduct is to deter violence and lawlessness. And that certainly applies to what we're talking about here today, about drug trafficking. And I think that trends into, then, the second tradition that we have of disarming individuals who pose a dangerous risk of misusing firearms. And so that dovetails very nicely. And I'll point to other historical analogs in that reference, things like – So, by biological extension, what you're saying is so anybody convicted of any felony is prone to dangerousness and violence. I don't know that I'm necessarily saying that, and I don't think you have to say that today in order to resolve this question, because drug trafficking, I think we can all agree, is an incredibly dangerous activity, especially when mixed with guns. Courts have been saying that for decades. Yeah, I was going to ask. We basically presume that if a gun is in proximity to drugs, it is related to the drug trade because we say the drug trade is inherently dangerous. Yes, 100%. I mean, that's well established in our law in different contexts. It is a well-established – I think that's exactly right. And then I will also point out that this is also how we talk about burglary. And you'll note that in the case law, frequently burglary and drug trafficking are combined, and they're spoken about in tandem in that way, that these are activities that are inherently prone to violence. They might not involve violence themselves, but they put us at great risk of violence. And I think that takes us back to this idea about Diaz, looking at historical crimes and analogizing to those that burglary, we all agree, was something that was punished severely and permanently at the founding, the how, permanent disarmament, the why being to deter violence. How does burglary relate to an illegal importation of marijuana? I'm so glad you asked because I don't want to suggest that we are matching historical crimes. They don't have to necessarily look alike. We are talking about the hows and the whys. We're talking about what is – if today, if the law that is being challenged is relevantly similar to what our founding fathers, to the laws that we were understood to permit. I thought what Diaz did was it looked at horse theft. It looked at other examples of theft and how theft was punished because what we had in Diaz was auto theft, right?  So in Diaz, I think that's actually an interesting point. The court could have stopped at horse theft, right? But it didn't. It actually talked about theft in very broad terms and pointed to a lot of different laws involving theft. And so it was not just relying on some kind of historical match. Do you know whether his theft conviction is a misdemeanor? Your Honor, I do not. I suspect that based on the penalty range, it may be a misdemeanor. But I am not certain. I haven't looked into that. Well, let's say – I mean, obviously Judge Ezra didn't have Diaz. And you all didn't even have the opportunity or didn't brief Diaz. So let's say somehow it goes back. Either we do Diaz with adequate briefing or it goes back to the district court. And let's say Judge Ezra has it. He says, you know, I think smuggling counts. So then the case proceeds to trial. Does the jury, are they told that the court has – that third element has been found beyond a reasonable doubt for them? Or do they get to revisit that? If Diaz really works and district courts are going to say, I think this is in or out. Therefore, the guy gets to go to trial. It's a qualifying offense, I think, legally. What happens when you get to the jury for charge confidence? I think that we don't know. And, I mean, I realize that's not helpful. I would like to be helpful. But I think that we don't know. I think that in this case specifically, I don't think that there are contested facts. I think that most of these cases present what is essentially a legal question. It's a legal inquiry. And I think that that can be resolved here purely on legal grounds. Probably. I'm just – again, I can't imagine how Diaz works. But if we do get there and district courts then are allowed, I think the jury's got to be able to revisit. They've got to find it beyond a reasonable doubt. Presumably, opposing counsel's right, he gets to offer evidence that the guy isn't dangerous. At least looking at his – looking at the remand here, can't only be for the government. That the government – in the Patilde's case, it's being remanded to find out is he actually dangerous or not. So, presumably, at trial, they'd be able to say, well, that's a 20-year-old marijuana thing. Look at all the good stuff he's done. So, a couple of points about that. First of all, the Sility's case also ranged – those are both taken in – those are individuals who are seeking prospective relief. And so I think that those are very different cases where they might be making a holistic analysis where they go back on remand and they actually look at everything and consider is this individual dangerous. And that's what Judge Thapar said in Williams. Look at everything. Well, but I don't think that he necessarily suggested that it was, like, an issue for the jury or that this was a holistic approach being taken to seek prospective relief. I think that what we see in Williams is that they're looking at convictions. And, yes, they're looking at misdemeanor convictions as well. But I think that they – well, but I still think that he says that there are some convictions that are per se sufficiently dangerous. And I think that the Third Circuit said that too in White, that in White there's a couple of different convictions that are at issue. But one of them is drug trafficking. And the White case actually references Williams and the statements that it made about drug trafficking. Drug trafficking convictions are per se violent and qualify. Is that categorical approach or do we get to look at the 20-year-old facts? I don't think that it is a categorical approach. Wow. Okay. So the 20-year-old state trial facts are going to come back into play. Well, I don't necessarily think the underlying fact – well, it depends on if they're contested, right? And, again, we don't really know some of these answers right now. We are moving incrementally, very piecemeal fashion. That's what this court did in Daniels. You sound like you're very familiar, and that's a genuine compliment. Aren't there at least two cases pending in front of the Supreme Court on 922g1? And the government's asked for extensions to be able to solidify its opinion. I'm not certain. Do you mind if I ask? Are you getting criminal appellate, solicitor general advice? Is this a uniform position the government's taking, or is this you're very smart and you're presenting your position? It is very difficult to take a uniform position when the circuits are not operating uniformly. Right. But I haven't seen you asking them to go en banc. For example, in this case, you didn't say, we don't like Diaz, we'd like to go en banc. You could have requested that. We could have, and we did not. So people for the same people with the same predicate are either going to jail in some parts of the country or not in other parts. And at the moment, the government's living with that. Yes. And I think that we, to some degree, have to because the circuits are operating in different ways right now. And so operating under Diaz, I think that when you apply Diaz, and I do want to make one point. And I made this point yesterday, that the dangerousness argument. You argued 922G yesterday too? I did. What was the predicate? It was a drug trafficking predicate also. Okay. So they go first in time. In your brief to us, you identified a few cases that we would have to wait for. We presented and we did file notices with the court that both of these cases were pending at the same time. And so we did notify the court. You're talking about Kimball? Yes.  Oh, I thought that was today. That was yesterday. So Kimball is the first in time. Well, I do believe Kimball was filed. I believe Kimball was filed first. It's been kind of odd because some of the things we've done. You'll figure it out because he's on both. That's true. And I've got it figured out. Well, let me just see if there's anything else that I feel the need to shore up. You were saying something about applying DS to this case and then we went off on. Yeah. Well, so this is what I was trying to get at is essentially this, is that we can combine these traditions. We take the traditions together. And so I think that we are seeing actually two approaches that are being taken in this court. A lot of circuits are sort of anchoring their analysis in dangerousness. Well, not a lot because only two other circuits are really addressing it. But this court is taking really two lines of thought, right? This court has also acknowledged and recognized a tradition of disarming individuals who pose a grave danger, right? And so you actually are going to, I think in this case, the reason that upholding this statute as to Orozco is that it fits neatly here in that tradition of severely and permanently disarming an individual who commits serious crimes, including those involving illegal trafficking, and also this tradition that illegal trafficking is inherently dangerous. And so you're combining those traditions together to affirm in this case. Did you mean to say illegal drug trafficking is inherently dangerous? Illegal drug trafficking, yes. All right. And again, this court only needs to decide the case that is in front of it. And we are moving incrementally, as was stated in Daniels and other cases. If there are no further questions, thank you. Thank you, counsel. Rebuttal. Okay, three things. The first one is I'm asking a question I can't answer. But, again, the notion that smuggling tobacco is a capital felony is new news to me. But I've read enough cases where they keep using this. There has to be a how and a why. So I would want to know why, and I'll look this up, I guess, for myself. Why was smuggling tobacco a capital felony if, in fact, it was? Because that would matter. Ms. Bradley made the point that drugs are often connected with firearms. Everybody knows that. The federal importation case that Mr. Orozco had, I cited in one of the briefs, and it may have been the one that has not been accepted, 312CR00546. I got the complaint and put the complaint information in the brief. Yes, he was driving drugs, but there was no mention of a firearm anywhere. So that distinguishes him from all other drug people. The last thing was this, and I didn't get a chance to mention it. Diaz is not the only one. United States v. Contreras, 425F4725. This guy was on supervised release for being a marijuana user in possession of a firearm. And the government argued that he was dangerous because he was a marijuana user in possession of a firearm. And the Fifth Circuit said, well, we disagree with that. The government's argument is too broad. It is premised on the notion that all felonies are created equal. None of the specific felonies the government points to are analogous to the facts here, namely that an unlawful user of a controlled substance. Okay, I'm going to skip down. So standing alone, these historical laws are not enough. Now, the court ultimately affirmed the constitutionality of 922G1 as to him because he was on supervised release. And there is obviously the time of the founding. If you're serving a sentence, then that was a basis for you not to have a firearm. Those are the only things that I can think of. If there's nothing else, I will yield back the rest of my time. I don't know how this works. She can't have it. Okay. I yield it to you then. We get it. Thank you very much. Thank you. All right. The court will take this matter under advisement. And we are adjourned.